Filed 6/28/16  (unmodified opn. attached; second modification)

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| WILLIAM E. RICE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>GARY P. DOWNS,<br><br>     Defendant and Appellant.<br>_____ | B261860<br><br>(Los Angeles County<br>Super. Ct. No. BC506921) |
| GARY P. DOWNS,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>WILLIAM E. RICE,<br><br>     Defendant and Appellant. | B264964<br><br>(Los Angeles County<br>Super. Ct. No. BC507050)<br><br>ORDER MODIFYING OPINION:<br>EDITORIAL INFORMATION ONLY<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the editorial information of the published opinion filed herein on June 1, 2016, as modified on June 23, 2016, be corrected as follows on pages 1 and 2 of the as-filed opinion:

1.  Delete the second box of the caption wherein Downs is the plaintiff and Rice is the defendant, and delete Los Angeles County Superior Court number BC507050.

2.  The two Court of Appeal case numbers are B261860 and B264964.

3.  The Los Angeles County Superior Court number is BC506921.

4.  For the appearances by the Glaser and Greines firms, delete "and Defendant and Appellant William E. Rice."

5.  For the appearance by the Shartsis firm, delete "and Plaintiff and Appellant Gary P. Downs."


There is no change in the judgment.


LUI, Acting P. J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WILLIAM E. RICE, | B261860 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC506921) |
| v. | |
| GARY P. DOWNS, | |
| Defendant and Appellant. | |
| _____ | |
| GARY P. DOWNS, | B264964 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC507050) |
| v. | |
| WILLIAM E. RICE, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the published opinion filed herein on June 1, 2016, be modified as follows:

On page 22 of the as-filed opinion, after part 4 of the Discussion, insert part 5 as follows:

**5.    Downs's claim the trial court erred by denying his request for additional fees and costs**

Finally, Downs argues that the trial court "erred in denying Downs' request for attorneys' fees and costs incurred in petitioning to confirm the Award and opposing Rice and Day's Petition to Partially Vacate, because Downs was the prevailing party in the Arbitration and had a contractual right to reimbursement." He acknowledges the trial court awarded him fees of $13,500 when it granted his petition to confirm the award (except as to the arbitrator's ruling to convert the dismissal without prejudice to one with prejudice), but erred by not awarding "any of the $320,164.68 he incurred to address Rice and Day's unauthorized and untimely Opposition and Reply or to prepare supplemental briefing as directed by the Superior Court."

Although Downs cites the appellate record for the trial court's ruling denying the request for additional fees, he fails to cite any portion of the appellate record substantiating his claim for $320,164.68. This, alone, is sufficient to reject his claim on the basis of forfeiture. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

Moreover, Downs's appellate claim is premised on his contention that the trial court erred by partially vacating the award, making him the prevailing party. It is largely mooted by our conclusions that the trial court erred by ordering the legal malpractice, breach of fiduciary duty, and rescission causes of action to be arbitrated. While Downs remains the prevailing party with respect to other claims, the substantial unapportioned fees he seeks on appeal pertain, at least in part, if not entirely, to matters upon which he is the *losing* party. Indeed, because the trial court granted the petition to partially vacate the arbitration award, the court's determination that it was unfair to require Rice and Day to pay Downs's attorney fees is quite sound. The reasonableness of attorney fees is entrusted to the trial court's discretion, and the success or failure of the attorney's efforts is a factor in determining reasonableness. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096.) For all of these reasons, we reject Downs's claim. If Downs wishes to seek additional fees he can actually attribute the matters upon which he

2

prevailed in the course of the post-arbitration petitions, he is free to request them from the trial court.

There is no change in the judgment.

Downs's petition for rehearing is denied.

CHANEY, Acting P. J.        JOHNSON, J.        LUI, J.

Filed 6/1/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WILLIAM E. RICE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>GARY P. DOWNS,<br><br>    Defendant and Appellant.<br>_____ | B261860<br><br>(Los Angeles County<br>Super. Ct. No. BC506921) |
| GARY P. DOWNS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>WILLIAM E. RICE,<br><br>    Defendant and Appellant. | B264964<br><br>(Los Angeles County<br>Super. Ct. No. BC507050) |

APPEALS from a judgment of the Superior Court of Los Angeles County. Yvette M. Palazuelos, Judge. Affirmed in part and reversed in part.

Glaser Weil Fink Howard Avchen & Shapiro, Michael Cypers, Julia B. Cherlow; Greines, Martin, Stein & Richland, Robin Meadow and Jeffrey E. Raskin for Plaintiff and Appellant and Defendant and Appellant William E. Rice.

Shartsis Friese, Joel Zeldin, Frank A Cialone and Felicia A. Draper for Defendant and Appellant and Plaintiff and Appellant Gary P. Downs.

_____

William E. Rice and others[1] sued Attorney Gary P. Downs for legal malpractice, breach of fiduciary duty, and breach of a written agreement Downs drafted to govern a limited liability corporation he formed with Rice and others. The trial court ordered Rice to arbitrate all of his claims pursuant to an arbitration provision in the written agreement. After arbitration, both Rice and Downs appealed, raising various contentions, including Rice's contention that the arbitration provision did not encompass his tort claims. We agree with Rice on this point and conclude the trial court erred by compelling arbitration of those claims. Accordingly, we partially reverse the judgment and conclude the other contentions on appeal are moot.

## BACKGROUND

### 1. Allegations of Rice's complaint

In April of 2013 Rice filed a complaint in Los Angeles Superior Court alleging legal malpractice and other claims. (Super. Ct. L.A. County, No. BC506921.) The complaint alleged that as of 2003, Downs and law firms in which he was a partner served as counsel for Rice, Kristoffer Kaufmann, and companies they were affiliated with. Rice, Kaufmann, and their companies did business in the affordable housing market. "Downs, Rice and Kaufmann decided they would form a company together to develop properties with affordable rents and government subsidies." To that end, Downs, acting as counsel for Rice, Kauffmann, and the new company, Highland Property Development, LLC (HPD) prepared an operating agreement and formed HPD. Downs entered into joint

_____

[1] The other plaintiffs were Douglas B. Day, Highland Property Development, LLC, and Highland Property Construction, Inc. The business entities did not appeal and Day dismissed his appeal.

2

ownership of HPD with Rice and Kaufmann while still acting as counsel to them, but "neither Downs, nor any of the law firms in which he was a partner, advised Rice, Kaufmann or HPD with respect to actual or potential conflicts of interest, nor did they comply with California Rules of Professional Conduct, Rule 3-300."

The operating agreement contained the following provisions relevant to this appeal:  "Each member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement." "Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in Los Angeles, California."  It further provided, "No Member or Affiliate of a Member, is entitled to remuneration for services rendered to the Company except as otherwise expressly provided for in this Agreement."

In 2007, Douglas B. Day joined HPD as a fourth member.  The complaint alleges that Downs, "again acting as counsel for all of the Plaintiffs," prepared an amended operating agreement for HPD and formed Highland Property Construction, Inc. (HPC) to contract for construction work on HPD projects.  Downs, Rice, Day, and Kaufmann were the shareholders in HPC.  "At no time did Downs, or the law firms of which he was a partner, advise of potential or actual conflicts, or comply with California Rules of Professional Conduct, Rule 3-300."  The amended operating agreement contained the same terms regarding arbitration, jurisdiction, and compensation quoted above.

The complaint further alleges that pursuant to the compensation provisions in the operating agreement and the amended operating agreement, Downs was not entitled to bill HPD for time he spent working on HPD legal (or other) matters, and he was not entitled to "be personally compensated for any HPD related work performed by others at his law firm."

The complaint further alleges that in 2012, based upon legal advice by Downs, Kaufmann was removed as a member and manager of HPD for cause.  Kaufmann

3

demanded arbitration, seeking a declaration that his removal was improper and he was still a member of HPD, along with damages and attorney fees. Downs arranged for a single attorney to represent himself, Rice, and Day in the Kaufmann arbitration, without disclosure or waiver of conflicts of interest.

The complaint alleges that, as a result of the Kaufmann arbitration, Rice and Day "learned that Downs had been billing HPD, through his law firm, for his personal time in providing legal services, both with respect to internal HPD affairs, and with respect to the various projects, contracts and other activities of HPD, even though this was prohibited under the terms of the Operating Agreement. Rice, Day and Kaufmann were not aware of this previously" because the law firms sent non-detailed invoices that did not specify the attorneys working on matters or the hours and billing rates of those attorneys. Rice and Day also "learned, for the first time, that Downs had . . . also been sharing in overrides and/or bonuses from his law firm, as a billing partner, for HPD work done by other attorneys at the firm. When confronted with this disclosure, Downs became hostile, accused Rice and Day of breaching the Operating Agreement or attempting to rescind or modify it unlawfully by challenging the payments Downs had received for HPD related legal services, and Downs filed an arbitration demand against Rice and Day, making those same accusations."

The complaint alleges Downs, acting as counsel for Rice, Day, Kaufmann, HPD, and HPC, committed legal malpractice by, inter alia, "failing to advise his clients of potential or actual conflicts, and obtain their informed consent before forming HPD and HPC, and drafting the Operating Agreements;" "entering into business transactions with his clients, specifically the formation of HPD and HPC, and the preparation and execution of their Operating Agreements, without advising of the potential conflicts and without complying with California Rules of Professional Conduct, Rule 3-300;" "placing his own interests above those of his clients, in part by drafting and structuring the Operating Agreement for HPD in a manner that, based on Downs' present contentions, was detrimental to his clients and beneficial to Downs;" and "providing poor or incorrect

4

legal advice and counseling with respect to the dispute with Kaufmann, resulting in exposure of HPD, Rice and Day to damages and litigation, including strategies premised on incorrect readings of the Operating Agreement, or ambiguities in the Operating Agreement drafted by Downs, and by arranging for a single attorney to represent Downs, Rice and Day without disclosing and obtaining informed consent to actual or potential conflicts."

The legal malpractice cause of action also alleges five categories of deficiencies in the original and amended operating agreements and alleges that Downs "cost HPD and the plaintiffs hundreds of thousands of dollars of damages and extra expenses by deliberately interfering with pending transactions involving HPD which were being handled by Nixon Peabody [Downs's firm], in order to obtain personal gain at the expense of HPD and the other members. . . . Downs caused the attorneys at Nixon Peabody to take actions that were detrimental to HPD and Plaintiffs, in an effort to coerce benefits for himself at the expense of his clients."

The complaint further alleged Downs and Nixon Peabody (also a named defendant) owed a fiduciary duty to Rice and the other plaintiffs "by virtue of their relationship as attorney and client," which Downs and Nixon Peabody breached by, inter alia, "failing to disclose and obtain waivers of actual and potential conflicts between Downs and his law firms on the one hand, and the other members . . . or . . . HPD or HPC on the other hand;" "by engaging in business transactions with clients without complying with the provisions of [California Rules of Professional Conduct,] Rule 3-300"; and causing "the attorneys at Nixon Peabody to take actions that were detrimental to HPD and plaintiffs, in an effort to coerce benefits for himself at the expense of his clients."

The complaint also asserted a breach of contract cause of action against Downs alleging that he breached the operating agreement "by secretly billing and being compensated for his own time" working on HPD matters and receiving "overrides or bonuses . . . for the services provided by others in his firm." The complaint further alleged Downs and Nixon Peabody were unjustly enriched by plaintiffs because Downs

and Nixon Peabody were "paid attorneys fees that were not owed, and which Downs, individually, and as a partner of Nixon Peabody, had agreed would not be charged."

Finally, the complaint sought rescission and restitution, alleging: "By virtue of Downs's legal malpractice, breach of fiduciary duty, his failure to comply with California Rules of Professional Conduct, Rule 3-300, and his failure to disclose and obtain informed consent with respect to actual and potential conflicts with his clients, Downs has improperly obtained benefits under the terms of the Operating Agreement and the Amended Operating Agreement of HPD. [¶] . . . But for the breach of fiduciary duty, legal malpractice and other misconduct of Downs, he would not have obtained those benefits and would not have rights under the Operating Agreement. Based on the conduct of Downs, his rights under the Operating Agreement are rescinded, and he is obligated to pay restitution to Rice, Day and Kaufmann, specifically, his 25% share of all profits received from HPD and HPC."

### 2. Downs's complaint

The day after Rice's complaint was filed, Downs filed his own complaint in Los Angeles Superior Court against Rice, Day, and Kaufmann. (Super. Ct. L.A. County, No. BC507050.) Downs sought declaratory and injunctive relief to void and prevent performance of a settlement agreement between Rice, Day, and Kaufmann.

### 3. Trial court compels arbitration

Downs moved to compel arbitration as to all causes of action in Rice's complaint, based upon the arbitration provisions in the original and amended operating agreements. Downs informed the court that the Kaufmann and Downs arbitrations had already been consolidated, and he wanted the claims in Rice's complaint to be resolved in the consolidated arbitration.

Rice simultaneously moved to stay the Downs arbitration in favor of litigating Rice's overlapping claims, which also involved Nixon Peabody, which was not a signatory to the agreements containing the arbitration provision. Rice also opposed the motion to compel arbitration. Nixon Peabody filed its own response to the motion to

6

compel arbitration, opposing arbitration of the malpractice and breach of fiduciary duty causes of action but not the remaining causes of action.

The trial court granted the motion to compel arbitration of all of the claims in Rice's complaint and denied Rice's motion to stay the Downs arbitration. With respect to the motion to compel, the trial court concluded that the arbitration clause was "broad enough to encompass tort causes of action" and "because the gravamen of these claims involves the Operating Agreements, these causes of action 'arise out of' the Operating Agreement."

### 4. Arbitration proceedings

Rice refiled his claims against Downs as a cross-claim in arbitration.

Rice apparently encountered significant difficulty, delay, and obstruction by Downs and Nixon Peabody in obtaining documentary discovery. In its postarbitration ruling on motions to confirm and vacate the arbitration award, the trial court recounted some of these problems and referred to "what Rice and Day persuasively characterize as a coordinated campaign to delay and deflect." Eventually, on the evening of December 20, 2013, a Friday, with the arbitration hearing scheduled to commence on January 13, 2014, Nixon Peabody sent "a disk containing approximately 20,000 emails and nearly 34,000 documents," yet failed to include all documents responsive to Rice's discovery requests. The following Monday, Rice dismissed his claims without prejudice.

Upon Downs's request, the arbitrator ordered Rice's claims dismissed with prejudice.

The arbitrator ultimately awarded Downs declaratory relief on two points: That he did not breach the original or amended operating agreement or any other obligation "by billing his time for legal services performed in connection with representing HPD" and that the settlement agreement between Rice, Day, and Kaufmann was void and Downs did not interfere with it. The arbitrator did not decide Downs's claim for declaratory relief to the effect he did not commit malpractice or breach of fiduciary duty. The

7

arbitration award required Rice, Day, and Downs to repay certain sums to HPD and awarded Downs and Kaufmann attorney fees against Rice and Day.

**5. Trial court partially vacates, but otherwise confirms arbitration award**

Downs filed a petition in the trial court to confirm the arbitration award. Rice filed a petition to vacate the arbitration award to the extent the arbitrator had converted his dismissal without prejudice into a dismissal with prejudice.

After extensive briefing and a lengthy hearing, the trial court granted both petitions, i.e., it reinstated Rice's dismissal *without* prejudice, but otherwise confirmed the arbitration award.

**6. Judgment and appeals**

The trial court entered judgment. Both Rice and Downs appealed, and the appeals were consolidated.

## DISCUSSION

**1. Pertinent legal principles**

A party who claims that there is an applicable written arbitration agreement may petition the superior court for an order compelling the parties to arbitrate. (Code Civ. Proc., § 1281.2.) Such a petition essentially seeks specific performance of the arbitration agreement. (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 356.) "In determining whether an arbitration agreement applies to a specific dispute, the court may examine only the agreement itself and the complaint filed by the party refusing arbitration." (*Weeks v. Crow* (1980) 113 Cal.App.3d 350, 353 (*Weeks*).) Because the trial court sits as a trier of fact in ruling on such a petition, its decision on the existence of a valid arbitration agreement will be affirmed on appeal if substantial evidence supports the ruling. (*Banner*, at pp. 356–357.) Where, as here, "there is no '*factual* dispute as to the language of [the] agreement' [citation] or 'conflicting extrinsic evidence' regarding the terms of the contract [citation], our standard of review of a trial court order granting or denying a motion to compel arbitration under [Code of Civil Procedure] section 1281.2 is de novo." (*Bono v. David* (2007) 147 Cal.App.4th 1055, 1061–1062 (*Bono*).) "We are

8

not bound by the trial court's construction or interpretation." (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 (*Coast Plaza*).)

"California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration. . . . This strong policy has resulted in the general rule that arbitration should be upheld 'unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute.' " (*Coast Plaza*, *supra*, 83 Cal.App.4th at p. 686.) The party opposing arbitration has the burden of demonstrating that an arbitration clause cannot be interpreted to require arbitration of the dispute. (*Id.* at pp. 686–687.) Nonetheless, this policy does not override ordinary principles of contract interpretation. "[T]he contractual terms themselves must be carefully examined before the parties to the contract can be ordered to arbitration: 'Although "[t]he law favors contracts for arbitration of disputes between parties" [citation], " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . .' " [Citations.] In determining the scope of an arbitration clause, "[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation]." ' " (*Bono*, *supra*, 147 Cal.App.4th at p. 1063.) "[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested." (*Ibid.*)

The ordinary rules of contract interpretation apply to arbitration agreements. (*Hotels Nevada, LLC v. Bridge Banc, LLC* (2005) 130 Cal.App.4th 1431, 1435.) "The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made (Civ. Code, §§ 1636, 1644, 1647)." (*Weeks*, *supra*, 113 Cal.App.3d at p. 353.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) " 'A court must view the language in light of the instrument as a whole and not

9

use a "disjointed, single-paragraph, strict construction approach" [citation].' " (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71.) An interpretation that leaves part of a contract as surplusage is to be avoided. (*Ibid*.)

"[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is 'broad' or 'narrow.' " (*Bono*, *supra*, 147 Cal.App.4th at p. 1067.) "A 'broad' clause includes those using language such as '*any claim* arising from or *related to* this agreement' " (*ibid.*) or "arising in connection with the [a]greement" (*Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 720–721 (*Simula*)). "It has long been the rule in California that a broadly worded arbitration clause . . . may extend to tort claims that may arise under or from the contractual relationship. 'There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that *the dispute* must arise out of contract.' " (*Coast Plaza*, *supra*, 83 Cal.App.4th at p. 686.) " '[W]here contracts provide arbitration for " 'any controversy . . . arising out of or relating to the contract . . .' " the courts have held such arbitration agreements sufficiently broad to include torts, as well as contractual, liabilities so long as the tort claims "have their roots in the relationship between the parties which was created by the contract." ' " (*Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1315–1316.) As the Ninth Circuit stated in *Simula*: "Every court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly. We likewise conclude that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." (175 F.3d at p. 721.) "To require arbitration, [the] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." (*Ibid*.)

But clauses requiring arbitration of a claim, dispute, or controversy "arising from" or "arising out of" an agreement, i.e., excluding language such as "relating to this agreement" or "in connection with this agreement," are "generally considered to be more

10

limited in scope than would be, for example, a clause agreeing to arbitrate ' "any controversy . . . arising out of *or relating to* this agreement," ' which might thus cover misconduct arising out of the agreement as well as contractual issues." (*Cobler v. Stanley, Barber, Southard, Brown & Associates* (1990) 217 Cal.App.3d 518, 530 (*Cobler*).) Several Ninth Circuit cases have held that agreements requiring arbitration of "any dispute," "controversy," or "claim" "arising under" or "arising out of" the agreement are intended to encompass only disputes relating to the interpretation and performance of the agreement. (*Mediterranean Enterprises v. Ssangyong* (9th Cir. 1983) 708 F.2d 1458, 1461, 1464 (*Mediterranean*); *Tracer Research v. Nat. Environ. Services Co.* (9th Cir. 1994) 42 F.3d 1292, 1295 (*Tracer*); *Cape Flattery Ltd. v. Titan Mar., LLC* (9th Cir. 2011) 647 F.3d 914, 921, 924 (*Cape Flattery*).)

## 2. The trial court erred by compelling arbitration of certain claims.

Rice contends the trial court erred by compelling arbitration of his legal malpractice, breach of fiduciary duty, and rescission claims because they are tort claims and the narrow arbitration provision in the operating agreements does not encompass them.[2] Downs contends the arbitration provision is sufficiently broad to encompass Rice's claims: "The parties' arbitration agreement governs 'any controversy arising out of' the HPD Operating Agreements. . . . 'Any controversy' includes tort claims, and tort claims can—and, in this case, they all do—arise out of those agreements."

Each party's approach is somewhat inadequate to resolve the issue before us. The issue is not resolved simply by determining whether the arbitration clause is narrow or broad, whether the arbitration clause *could* encompass tort claims, or even whether the claims in issue sound in tort, not contract. The issue is whether the particular claims in issue are controversies "arising out of" the operating agreements. While they clearly fall

---

[2] Downs argues Rice waived his contention that the rescission claim was not arbitrable by failing to raise it in the trial court. He is wrong. Rice asserted this claim in both his motion to stay arbitration and his opposition to Downs's motion to compel arbitration.

11

within the category of "any controversy," we conclude that they did not arise out of the operating agreements and should not have been ordered to arbitration.

### a. "Any controversy"

Several courts have held that a phrase such as "any dispute" or "any controversy" potentially encompasses tort claims. (*EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1322 (*EFund*); *Lewsadder v. Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 259 (*Lewsadder*).) We agree, but that alone is not determinative. The parties did not simply agree to arbitrate "any controversy," effectively meaning every controversy between them. "Any controversy" is necessarily modified by "arising out of this Agreement."

Moreover, even under a very broad arbitration provision, such as "any controversy or claim arising out of or relating to this agreement," tort claims must " 'have their roots in the relationship between the parties which was created by the contract' " before they can be deemed to fall within the scope of the arbitration provision. (*Bos Material Handling, Inc. v. Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 105 (*Bos*).) In *Coast Plaza*, where the parties had "agreed to arbitrate '*any* problem or dispute' that arose under or concerned the terms of the Service Agreement" (83 Cal.App.4th at p. 684), the appellate court examined the claims and concluded, "These claims unquestionably have arisen under the Service Agreement and are inextricably related to its terms and provisions" (*id.* at p. 685).

Similarly, the *EFund* and *Lewsadder* courts did not end their analysis by concluding that tort claims were potentially embraced within the scope of "any dispute" or "any controversy." In each case, the court examined the nature of the agreement and of the claims and their relationship to one another, determining that the particular claims arose "from or out of" the agreement (*EFund*, *supra*, 150 Cal.App.4th at pp. 1325–1326) or arose " '*out of my employment* or the termination of my employment' " (*Lewsadder*, *supra*, 36 Cal.App.3d at pp. 257, 259–261).

12

**b.    "Arising out of" the operating agreements**

We view the operating agreements' arbitration provision in the context of the whole agreements, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreements were made, and attempting to give effect to every part, if reasonably practicable, with each clause helping to interpret others. In this case, the parties' intent is revealed by contrasting the narrowly worded arbitration clause with the immediately preceding, expansively worded jurisdiction clause. While the parties consented to jurisdiction in state and federal courts sitting in California for "any action on a claim *arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement*" (italics added), they agreed to arbitrate only "any controversy between the parties arising out of this Agreement." Viewing these adjacent provisions together, it seems clear that the parties intended to arbitrate only a limited range of claims, i.e., those arising out of the agreement, while litigating a much broader range of claims, i.e., any claim arising out of, under, or in connection with the agreement or transactions contemplated by the agreement. The parties could easily have copied and pasted the broader text from the jurisdiction clause to the arbitration clause, but chose not to do so. This omission has significance, especially in light of precedent in the courts specified in the jurisdiction clause, on which the parties and the attorneys who drafted the agreement (Downs and/or others in his firm) were entitled to, and presumably did, rely.

" 'As a general rule of construction, the parties are presumed to know and to have had in mind all applicable laws extant when an agreement is made. These existing laws are considered part of the contract just as if they were expressly referred to and incorporated.' [Citation.] Existing law includes the common law of the state." (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 281.) With respect to the wording of arbitration clauses, the court in *Cape Flattery* observed and held: "There is a good reason to indicate clearly to contracting parties what specific language will signify that the scope of their arbitration agreement is narrow. Once they

13

know the specific language that is required, they can rely on that language to produce a result they jointly desire. . . . [I]n this case, when [the parties] entered into the Agreement, *Mediterranean* and *Tracer* had both been decided. The Agreement concerned the salvage of a vessel that had run aground in the Ninth Circuit. There is no reason to believe that the experienced lawyers representing both parties intended that the language they chose would be interpreted differently than it had been in those cases. [¶] We conclude that because the language in the arbitration provisions in *Mediterranean* and *Tracer* is the same as the language in the Agreement, the narrow interpretation of 'arising under' in those cases controls." (647 F.3d at p. 923.)

The parties in this case entered into the original operating agreement in 2003, by which time it was well established in both state and Ninth Circuit decisions that an arbitration provision that included both the "arising from" or "arising out of" type of language *and* a phrase such as "in connection with" or "relating to" extended the scope of an arbitration provision to also encompass tort claims having " 'their roots in the relationship between the parties which was created by the contract' " (*Bos*, *supra*, 137 Cal.App.3d at p. 105) and "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract" (*Simula*, *supra*, 175 F.3d at p. 721), whereas provisions using only phrases such as "arising out of" or "arising from" were narrower in application and extended only to disputes relating to the interpretation and performance of the agreement (*Cobler*, *supra*, 217 Cal.App.3d at p. 530; *Mediterranean*, *supra*, 708 F.2d at p. 1464; *Tracer*, *supra*, 42 F.3d at p. 1295).

Four years later, when the parties entered into the amended operating agreement in October of 2007, the state of the law remained the same in California courts and the Ninth Circuit. *EFund*, upon which Downs relies, and *Bono*, upon which Rice relies, had both been decided, but neither changed the state of the law. *Bono* involved a very specific and narrow arbitration clause applying to "any controversy among the parties involving the construction or application of any provision of this Agreement," and the

14

court concluded it did not encompass a defamation claim by one contracting party against another. (147 Cal.App.4th at pp. 1058, 1067, 1069.) *EFund* involved an unusually worded arbitration provision applying to "[a]ny dispute or other disagreement arising from or out of" the agreement. (150 Cal.App.4th at p. 1317.) The appellate court not only concluded that each cause of action stemmed from the relationship created by the agreement and thus arose " 'from or out of' " it, it also distinguished the language of the parties' arbitration clause from the standard narrow " 'arising out of' " type of clause: "The crucial language in the . . . arbitration clause differs from that discussed in the two Ninth Circuit opinions relied upon by the trial court. The critical language in the two Ninth Circuit opinions were 'arising hereunder' in *Mediterranean Enterprises, Inc.* and 'arising out of this Agreement' in *Tracer Research.* [Citation.] By contrast the language in the arbitration clause in this case is materially broader—'arising from or out of'—than that in *Mediterranean Enterprises, Inc.* or *Tracer Research.* Moreover, as we have explained, language of the type at issue here, *when broadly construed*, has consistently been applied in California opinions to require arbitration of tort claims." (150 Cal.App.4th at p. 1328, italics added.) Moreover, even if we were to assume *EFund* effected some change in the state of the law, the parties did not modify the language of the arbitration provision in the amended operating agreement to take advantage of such a change. They easily could have added "from or" to their arbitration provision to take advantage of the ruling in *EFund*, but did not do so.

Given both the state of the law at the time the parties entered into the original and amended operating agreements and the stark contrast between the parties' limited arbitration provision applying only to controversies "arising out of" the agreement and their much broader jurisdictional provision extending to claims "arising out of, under or in connection with" the agreements or "the transactions contemplated by" the agreements, we necessarily conclude the parties intended the arbitration provision to apply to a very limited range of controversies, not ones merely connected with the operating agreements or transactions contemplated by those agreements and certainly not

15

all controversies between them. Had the parties intended a broadly applicable arbitration clause, they could have simply used the same phrasing they used in the jurisdiction clause. The parties, as well as the attorneys drafting the agreements, are presumed to be aware of and to have relied upon the judicial interpretation in California and the Ninth Circuit of the language they used.

Accordingly, we conclude that while the arbitration provision encompasses contractual claims and perhaps even tort claims arising from the agreement, a tort claim based upon violation of an independent duty or right originating outside of the agreement does not *arise* from the agreement and falls outside the scope of the arbitration provision.

**c.    Rice's malpractice, breach of fiduciary duty, and rescission claims do not arise out of the operating agreements**

**1.    Malpractice cause of action**

Rice's complaint alleges that Downs and his law firms represented Rice and Kauffman before the three men decided to create a business together, before Downs formed HPD, and before he prepared the operating agreement. This attorney-client relationship did not arise out of the operating agreement or even the parties' decision to go into business together. Moreover, neither the original nor the amended operating agreement addresses an attorney-client relationship between Downs and anyone else, including Rice or HPD. The legal malpractice cause of action alleges that Downs violated duties created by his attorney-client relationship with Rice by acts and omissions such as failing to advise of his actual and potential conflicts of interest, entering into business transactions with his clients, and providing poor or incorrect legal advice. The cause of action is based upon violations of duties created by the attorney-client relationship, not by the operating agreements. The cause of action does not turn on an interpretation of any clause in the contract and is not based upon performance or failure to perform under the contract. Thus, the malpractice cause of action does not *arise out of* the agreements. It may relate to the agreements or be connected with them, but the parties' arbitration provision is limited to claims arising out of the agreements.

16

Accordingly, the arbitration provision does not encompass the legal malpractice claim, and the trial court erred by compelling arbitration of it.

Downs argues, with respect to each cause of action, that it arises out of the agreements because, but for the agreements, the claim would not exist. He cites *Adam v. DeCharon* (1995) 31 Cal.App.4th 708 (*Adam*) for the proposition that this "but for the agreement" standard is used to determine whether a claim arises out of an agreement. In *Adam*, a home seller failed to disclose known drainage and flooding problems, in violation of Civil Code section 1102 and a provision of the contract for the sale of the home that required the seller to deliver a disclosure statement. The purchasers prevailed on their failure to disclose cause of action, but not their breach of contract cause of action. The issue on appeal was whether the purchasers were entitled to attorney fees under the fees provision in the real property purchase-sale contract, which allowed the prevailing party to recover fees "in 'any action . . . arising out of this agreement.' " (31 Cal.App.4th at pp. 710–712.) Although the purchasers were not entitled to recover attorney fees under Civil Code section 1717 because they did not prevail on their breach of contract cause of action, the appellate court concluded they were entitled to recover fees under Code of Civil Procedure section 1021 and explained: "One of the causes of action on which the Adams prevailed was the failure of DeCharon to comply with the requirements of Civil Code section 1102 et seq. She did not complete the real estate transfer disclosure statement. That this cause of action concerns the violation of a statute does not make it any less one arising from the agreement. But for the agreement to purchase, there would be no cause of action for violation of section 1102 et seq. Moreover, section 13 of the real estate contract required DeCharon to deliver the disclosure statement within two calendar days of Seller's acceptance." (31 Cal.App.4th at p. 712.)

*Adam* obviously did not pertain to the wording of an arbitration clause, and the court did not hold that a claim "arises out of" an agreement if, but for the agreement, the claim would not exist, as Downs urges. Moreover, *Adam* is distinguishable from the

17

present case, even beyond the differing factual context. In *Adam*, the relationship between the seller and purchasers of the property stemmed solely from the real property purchase-sale contract. The seller's disclosure obligation came into existence only upon formation of that contract, and the contract reflected the statutory disclosure obligation. Here, however, the attorney-client relationship between Rice and Downs and the duties Rice alleges Downs and his firm breached predated the operating agreements, were not created by the operating agreements, and were not even mentioned in the operating agreements.

Although other courts have sometimes used similar "but for" language in explaining their rationale for concluding that a claim was arbitrable (see, e.g., *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227, 230 ["very broad" arbitration clause extending to " '[a]ny controversy or claim arising out of or relating to any provision of this [partnership] [a]greement or the breach thereof' "]), no court has adopted such a simplistic, sweeping standard to determine whether a claim arises out of an agreement, and the Ninth Circuit and other federal decisions have expressly rejected it (*Tracer*, *supra*, 42 F.3d at p. 1295 ["The fact that the tort claim would not have arisen 'but for' the parties' licensing agreement is not determinative"]; *Cape Flattery*, *supra*, 647 F.3d at p. 924 ["*Tracer* further clarified that a tort claim is not arbitrable just because it would not have arisen 'but for' the parties' agreement"]; *Armada Coal Export, Inc. v. Interbulk, Ltd.* (11th Cir. 1984) 726 F.2d 1566, 1568 ["While certainly there is a connection between Armada's claims and the charter party relationship between Armada and Interbulk—*i.e.,* but for the two parties having entered into this business arrangement which was imperfectly performed, there would have been no wrongful attachment and conversion—such connection is not sufficiently close to constitute a dispute arising during the execution, or performance, of the charter party itself"]).

Citing *Ericksen, Arbuthnot, McCarthy, Kearney, & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, Downs further argues that "claims going to the formation of a

18

contract which contains an arbitration provision are subject to arbitration." However, this applies only to claims of fraud in the inducement. "[A]n arbitration clause may be subject to enforcement even where a challenge exists to the validity of the overall agreement, if the challenge is based upon fraud in the inducement, and if the FAA applies. The reason for this is that under *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404 [18 L.Ed.2d 1270, 87 S.Ct. 1801], an FAA case, 'claims of fraud in the inducement of the contract generally,' that is, fraud claims not going ' "to the 'making' of the agreement to arbitrate," are to be decided by the arbitrator rather than the court,' unless the parties have agreed otherwise. (*Rosenthal* [*v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394,] 419.) There, the Supreme Court states that [Code of Civil Procedure] section 1281.2 embodies the same standard of enforceability as in the FAA. (*Rosenthal*, *supra*, at p. 415; *Ericksen, Arbuthnot, McCarthy, Kearney, & Walsh, Inc. v. 100 Oak Street*[, *supra*, 35 Cal.3d at pp. 322–323].)" (*Duffens v. Valenti* (2008) 161 Cal.App.4th 434, 448–449.) Rice does not allege either operating agreement was the product of fraud and does not challenge its overall validity. In his final cause of action, he seeks its rescission only as to Downs.

### 2. Breach of fiduciary duty

Like the malpractice cause of action, the breach of fiduciary duty cause of action is also premised upon a duty owed to Rice and the other plaintiffs "by virtue of their relationship as attorney and client," which preceded the formation of the business and the operating agreements. These duties did not arise from the operating agreements, and the cause of action neither depends upon an interpretation of any portion of the agreements nor is based upon performance or failure to perform under the agreements. Thus, the breach of fiduciary duty cause of action does not *arise* from the agreements, although it may relate to the agreements or be connected with them. Accordingly, the arbitration provision does not encompass the breach of fiduciary duty claim, and the trial court erred by compelling arbitration of it.

19

### 3.     Rescission

The final cause of action in Rice's complaint, seeking rescission and restitution, was expressly based upon "Downs's legal malpractice, breach of fiduciary duty, his failure to comply with California Rules of Professional Conduct, Rule 3-300, and his failure to disclose and obtain informed consent with respect to actual and potential conflicts with his clients." All of these were alleged violations of duties owed to Rice by virtue of the attorney-client relationship between Downs and Rice, not as a result of any duty created by the operating agreements. Although the cause of action alleges that, as a result of Downs's violations of these duties, he "improperly obtained benefits under the terms of the Operating Agreement and the Amended Operating Agreement of HPD," thereby connecting the cause of action to the agreements, it does not arise out of those agreements. The duties Downs allegedly violated did not arise from the operating agreements, and the cause of action neither depends upon an interpretation of any portion of the agreements nor is based upon performance or failure to perform under the agreements. Accordingly, the arbitration provision does not encompass this cause of action, and the trial court erred by compelling arbitration of it.

### 3.     Order partially vacating arbitration

Downs contends that the trial court erred by partially vacating the arbitration award to convert the dismissal of Rice's claims from one with prejudice to one without prejudice. Our review of the trial court's order and rationale leads us to conclude the issue is moot in light of our conclusion that Rice was improperly compelled to arbitrate his malpractice claim.

Although Rice dismissed all of his claims, including his arbitrable contractually based claims, the arbitrator converted the dismissal of all claims from one without prejudice to one with prejudice. Rice's motion in the trial court seemingly addressed all of his claims. A close examination of the trial court's rationale in reinstating the dismissal to one without prejudice reveals that the scope of the court's ruling was necessarily confined to Rice's malpractice claim. First, the court frequently referred to

20

the malpractice claim in its order, but did not refer to any of Rice's other claims. Second, the court addressed at length Rice's contention that there was "Fraud in the Arbitration," based solely upon two matters pertinent to the issue of whether Downs represented Rice (and Day) as individuals. The first of these matters was Rice's claim "that Downs falsely testified before this Court and the Arbitrator" that he and his firms represented only HPD and HPC. The second matter was what Rice relied upon to refute Downs's purportedly false testimony, i.e., "23 fully-vetted Opinion Letters stating conclusively that the firms represented Rice and Day" issued by Nixon Peabody and Downs's former firm, Pillsbury. The court stated, "Rice and Day argue that Downs and Nixon coordinated efforts to effectively deprive Rice and Day of *documents pertaining to their malpractice claim* that Plaintiffs requested even as of August 2013." (Italics added.) The court addressed at length the difficulty Rice had in obtaining documentary evidence from Downs and Nixon Peabody through discovery requests in the arbitration, whether and when Rice became aware of the opinion letters—to which they had access through HPD servers—and their significance. The court stated that Rice "persuasively characterize[d]" the conduct of Downs and Nixon Peabody "as a coordinated campaign to delay and deflect." The court noted that "Rice and Day's attorney expressed the reason for dismissing *the malpractice claim* was that Plaintiffs' efforts to procure discovery documents had been frustrated, despite the Arbitrator's ruling on the matter." (Italics added.) Also notable is the court's reference to Rice's "Appendix A: Index of Issues Affected by Downs' Misstatements at Arbitration," which mentioned several causes of action by other parties, but only one of Rice's causes of action: malpractice, specifically the arbitrator's conversion of the dismissal of his malpractice claim from one without prejudice to one with prejudice. Ultimately, the trial court found "that the Opinion Letters were available to counsel before counsel moved to dismiss the malpractice claim, without prejudice. However, as further explained below, the Court also finds that when the Opinion Letters were discovered by counsel is not determinative of the issues of whether the request to vacate the dismissal, with prejudice, was proper, or whether the Arbitrator exceeded her

21

authority." The trial court's entire discussion of fraud and undue means in the arbitration leading to the dismissal pertained to competing evidence on the issue of whether Downs represented Rice, which is only pertinent to Rice's tort causes of action, not the breach of contract and unjust enrichment causes of action, which were based upon Downs's billing for legal services provided to HPD and HPC.

The trial court rejected the fraud and undue means theories and based its decision to restore Rice's dismissal to one without prejudice upon a theory that the court had "inherent power to prevent unfair results." The court explained: "[I]t is unjust to punish Rice and Day for their attorney's choice to dismiss, without prejudice, when he would not have done so had he any idea that the dismissal, without prejudice, would be converted to a dismissal, with prejudice. Balancing the facts, both sides share blame about the Opinion Letters not rising to the surface in time. Rice and Day did not knowingly choose to avoid that information and certainly Downs never highlighted that information, if only to address it head on, in time either. [¶] The court finds that justice requires that the Arbitrator's dismissal, with prejudice, be vacated and the dismissal, without prejudice, be reinstated. If the action is resumed, then the parties should commence arbitration of *the malpractice claim*." (Italics added.)

Accordingly, we construe the trial court's ruling as limited to the malpractice claim, and Down's contention about the propriety of the court's ruling is mooted by our conclusion that the malpractice claim was not subject to arbitration.

## 4.     Rice's claim regarding possibility of conflicting rulings

Rice also contends that the trial court abused its discretion by failing to deny Downs's motion to compel arbitration pursuant to Code of Civil Procedure section 1281.2, subdivision (c). This contention is based upon the inclusion of Nixon Peabody as a defendant in Rice's breach of fiduciary duty cause of action, given that the firm was not a party to the operating agreements and therefore not subject to arbitration. In light of our disposition, this issue is also moot and we do not address it.

22

**DISPOSITION**

The judgment is reversed with respect to the court's order compelling arbitration of Rice's legal malpractice, breach of fiduciary duty, and rescission causes of action and is otherwise affirmed. Rice is awarded his costs on appeal and his own cross-appeal.

**CERTIFIED FOR PUBLICATION.**


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

23